[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10485

_____

D.C. Docket No. 0:19-cv-61374-WPD

RAMI ZIYADAT,

Plaintiff - Appellant,

versus

DIAMONDROCK HOSPITALITY COMPANY,
d.b.a. The Westin Beach Resort Fort Lauderdale,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 13, 2021)

Before JILL PRYOR, NEWSOM and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

This appeal arises out of a lawsuit brought by a former guest at a Florida hotel alleging (as relevant here) a violation of 42 U.S.C. §1981, which prohibits racial discrimination in contracting.  In particular, the guest, who is Arab, claims that one of the hotel's employees falsely accused him of engaging in inappropriate behavior at the pool, that the employee did so because she harbored animus against Arabs, and that employee's accusation led to his eviction.  The district court held that the allegations in the guest's complaint failed to state a claim under § 1981 and thus dismissed the case with prejudice.  Because we conclude—at this preliminary stage, anyway—that the guest's allegations plausibly allege a circumstantial case of racial discrimination, we vacate and remand for further proceedings.

**I**

**A**

Rami Ziyadat reserved an eight-night stay at the Westin Fort Lauderdale in his own name.  He and his fiancée, Taylor Schneider, arrived together and enjoyed their first three days at the Westin without incident.  On the fourth day, Ziyadat and Schneider went to the pool, ordered a drink, and headed toward a nearby area to tan.  The parties offer different accounts of what happened next.

According to Ziyadat's story—which we must accept as true for purposes of this appeal—when he got up for some water, the towel attendant stared at him.  In particular, Ziyadat says, the attendant seemed to be staring at his tattoo, which

2

included faded Arabic letters and a chain encircling his bicep. According to Ziyadat, as he and Schneider were getting out of the pool, the attendant said to him: "You don't look like you belong here. What are you doing here?" Ziyadat told the attendant that he and Schneider were hotel guests and asked her what she meant. She responded that she was calling security.

The towel attendant had a different story. According to her, Ziyadat was engaging in inappropriate behavior in the presence of children—including trying to remove Schneider's bikini top. She also claimed that he was using profane language and that he vomited in the pool. Ziyadat denies all this; he says that he acted pleasantly and that the towel attendant's account—the bikini, the profanity, the vomit—was a "complete fabrication."

Ziyadat alleges that he and Schneider left the pool and went to the front desk, where they told a manager, Robert Munn, their version of events. Munn issued them vouchers and then went to visit with his family, who had just arrived. Ziyadat and Schneider returned to the pool, but, according to Ziyadat, they felt like they were being watched by two security guards. As Ziyadat explains it, the towel attendant had told one of the guards her story about his supposed misbehavior.

Ziyadat and Schneider abandoned their pool plan and instead went up to their room to get ready to explore the Everglades. But as they were preparing to leave, they heard a knock at their door. It was Munn and the head of security.

3

Munn explained to Ziyadat and Schneider that they were being evicted for "inappropriate" behavior and for "violat[ing] hotel policy." Ziyadat and Schneider were then escorted out by security. And to add insult to injury, Munn denied their refund request for the remaining days.

Ziyadat is Arab and has a beard. He says that none of the other hotel guests around that afternoon looked Arab. And he claims that while he and Schneider were at the pool, the towel attendant treated the other guests "pleasantly and cordially." Accordingly, Ziyadat alleges that the towel attendant fabricated her story because he is Arab. And that story, Ziyadat continues, led Munn to evict him. The towel attendant, he posits, conveyed her story to the security guard, who in turn conveyed the same lie to Munn. According to Ziyadat, Munn merely parroted what he'd heard from either the towel attendant or the security guard and spent no time independently investigating the poolside incident because he was spending time with his family.

**B**

Ziyadat sued Diamondrock Hospitality Company d/b/a The Westin Beach Resort Fort Lauderdale. He alleged that the Westin discriminated against him in violation of 42 U.S.C. § 1981, breached its contract with him, and defamed him. In particular, Ziyadat contends that the towel attendant saw that he was Arab,

4

fabricated a story about him, communicated that story to management via the security guard, and thereby caused the manager, Munn, to evict him.

The Westin filed a motion to dismiss Ziyadat's complaint for failure to state a claim, which the district court granted. The district court reasoned that even if Ziyadat had sufficiently alleged that the towel attendant mistreated him because of his race, he had not alleged that her racial animus caused his contractual injury—namely, his eviction. The court reasoned that the allegations suggested that Munn spoke to Ziyadat, Schneider, and the security guards, but not the towel attendant, and, therefore, that the towel attendant's alleged animus played no causal role in Ziyadat's contractual injury. Having dismissed Ziyadat's federal claim, the district court declined to exercise jurisdiction over his state-law breach of contract and defamation claims and dismissed the case.

On appeal, Ziyadat contends that he has alleged a plausible claim that the Westin discriminated against him in violation of § 1981 because the towel attendant's discriminatory animus against him caused her to fabricate a story that, in turn, caused Munn to evict him.[1] In the alternative, he argues that, even if he failed to state a claim under § 1981, the district court erred in denying his request for leave to submit an amended complaint.

---

[1] We review dismissals for failure to state a claim de novo. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1066 (11th Cir. 2017).

## II

Under Rule 12(b)(6), a court should dismiss for failure to state a claim only when the plaintiff's factual allegations, if true, don't "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether allegations satisfy this standard, we must "view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). But we must ignore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

As relevant here, in order to state a claim under § 1981, Ziyadat must allege (1) intentional racial discrimination (2) that caused a contractual injury. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). A contractual injury includes any injury relating to "the making, performance, modification, [or] termination of [the] contract[]," or to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

**A**

As to the first element, a plaintiff may establish racial discrimination directly or circumstantially. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).

Here, Ziyadat hasn't adequately alleged direct discrimination. To state a claim for direct racial discrimination, a plaintiff must allege the overt invocation of race by the alleged discriminator—for instance, the use of a racial slur or racially charged language. *See Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (intentional discrimination established directly where defendant's employee used a racial slur); *cf. Lopez v. Target Corp.*, 676 F.3d 1230, 1231–33 (11th Cir. 2012) (defendant conceded intentional discrimination where its employee mocked and spoke slowly and loudly toward Hispanic customer). Ziyadat's complaint contains no such allegations.

He doesn't contend that the towel attendant ever disparaged his race, used racially charged language, or otherwise said anything about race to anyone. To be sure, Ziyadat alleged that the towel attendant stared at him and his tattoo and said, "You don't look like you belong here. What are you doing here?" But the fact that she purportedly acknowledged how he "look[ed]" no more establishes that she discriminated against him because of his race than it establishes that she discriminated against him because of his facial hair, tattoos, height, demeanor,

7

clothing, or physique.  Because not all discrimination based on appearance is based on race, Ziyadat hasn't alleged facts that would establish direct discrimination.

We conclude, though, that Ziyadat has alleged a plausible circumstantial case of racial discrimination.  A § 1981 plaintiff seeking to prove racial discrimination by circumstantial evidence may proceed under the *McDonnell Douglas* burden-shifting framework, which was originally conceived for Title VII claims.  *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (en banc).  To make out a prima facie case, the plaintiff must point to comparators of a different race who were "similarly situated in all material respects" and were not subject to the same mistreatment.  *Id*. at 1229.  In the employment context, this typically means that the comparators must have engaged in the same basic conduct or misconduct, been subject to the same policy, worked under the same supervisor, and had similar work experience and disciplinary history.  *Id*. at 1227–28.

Ziyadat has adequately alleged that he was treated differently from comparators who were similarly situated to him in all material respects.  Ziyadat says that he and his fiancée were hotel guests, sat by the pool, and behaved entirely appropriately.  He alleges that other, non-Arab hotel guests sat by the pool and acted similarly.  In other words, they all engaged in the same basic conduct.  He then claims that the towel attendant singled out him and his fiancée, fabricated a

8

story about them, and caused them to be evicted.  Of course, if, following discovery, the Westin proves that Ziyadat, in fact, didn't behave appropriately—but rather vomited in the pool, used profanity, and attempted to undress his fiancée poolside—then the other guests at the pool would no longer be valid comparators.  But assuming all of his allegations are true—again, as we must at this stage—the only material difference between him and the others at the pool was his race, and only he was evicted.[2]

So in sum: We hold that, at this stage of the proceedings, Ziyadat has alleged intentional racial discrimination by the towel attendant sufficient to survive a motion to dismiss.

**B**

Ziyadat also bears the burden of showing that race was a but-for cause of his injury.  *Comcast*, 140 S. Ct. at 1014.  When the intentionally discriminating employee does not herself have decisionmaking authority, the plaintiff must

---

[2] Ziyadat also alleged that the towel attendant fabricated the story that Schneider—his non-Arab fiancée—participated in the inappropriate poolside conduct.  The Westin argues that because the towel attendant took the identical allegedly discriminatory action against Ziyadat's fiancée, Ziyadat hasn't demonstrated that he was treated differently from *all* of his comparators, and so his claim of discrimination fails.  But construing the allegations in Ziyadat's favor, as we must, it is not unreasonable to infer that Schneider was just collateral damage of the pool attendant's treatment of Ziyadat.  Therefore, the allegation that the towel attendant also fabricated a story about her is consistent with, rather than a refutation of, her supposed discriminatory animus against Arabs.  *Cf. Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.").

plausibly allege that the discriminating employee's racial animus (1) was intended to cause and (2) did cause the contractual injury. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999). Ziyadat has plausibly alleged both here.

First, Ziyadat has sufficiently alleged that the towel attendant intended to cause him a contractual injury. According to Ziyadat, the attendant (1) said "[y]ou don't look like you belong here" and asked "[w]hat are you doing here?", (2) announced that she was calling security, (3) summoned security guards to the pool, and (4) fabricated a story to the security guards about Ziyadat's misconduct—all as part of a "deliberate attempt to cause [him] injury." At this stage of the proceedings, we think it a reasonable inference that the attendant's statements that Ziyadat didn't belong "here" meant that she thought he didn't belong *at the Westin*—and thus should be evicted. *Cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 423 (2011) (finding that lower-level employees intended to cause a contractual injury where they had said they were "out to get" and "get rid" of the plaintiff).

Second, Ziyadat has plausibly alleged that the towel attendant's racial animus in fact caused his contractual injury—his eviction. *See Comcast*, 140 S. Ct. at 1014. Under but-for causation statutes, like § 1981, we ask whether the discriminatory conduct had a "determinative influence" on the injury. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013). Again, Ziyadat has alleged that

10

he behaved appropriately, that the towel attendant fabricated a story about him, that she communicated it to security and that security communicated it to Munn, and—most importantly—that Munn had no other reason to evict him.  Because, on Ziyadat's allegations, the towel attendant's story was the only basis for his eviction, it had a "determinative influence" on, and thus was a but-for cause of, his eviction.  In reaching the contrary conclusion, the district court reasoned that Ziyadat didn't allege sufficient facts to support the conclusion that Munn failed to undertake an independent investigation.  But at this stage, Ziyadat is required only to allege that the towel attendant's discriminatory animus caused his eviction, not to conclusively rebut other possibilities with no basis in the record.  At summary judgment, the Westin may yet demonstrate that, in fact, Munn conducted an independent investigation and that Ziyadat's eviction wasn't caused by the towel attendant's allegedly fabricated story, but rather by Ziyadat's own misconduct.  But based on the allegations in the complaint, nothing but the towel attendant's fabricated story could have caused the eviction, so we conclude that Ziyadat has met the causation element.

\*       \*       \*

There is one last thing.  The parties devote considerable attention to the applicability of the so-called "cat's paw" theory of liability to § 1981, which, as already explained, requires a plaintiff to show that race was the but-for cause of his

injury, rather than just a "motivating factor."  Pursuant to the cat's-paw theory, a defendant may be held liable for the racial animus of its non-decisionmaking employee when, as is alleged here, that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff.  *See Stimpson*, 186 F.3d at 1332.  All agree that a defendant can be held liable for racial discrimination based on the cat's-paw theory when the governing statute requires that race be a motivating factor in the injurious decision.  *See, e.g.*, *Staub*, 562 U.S. 416–22.  But the Westin argues that it can't be held liable based on the cat's-paw theory when, as in this case, the governing statute requires that race be a but-for cause of the injurious decision.

We see no reason why the cat's-paw theory is incompatible with a but-for causation standard.  The cat's-paw theory concerns the conditions under which a lower-level employee's animus can be imputed to a decisionmaker.  The motivating-factor and but-for standards concern causation.  In a cat's-paw case, we merely apply the operative causation standard—whatever it may be—to the actions of the lower-level employee.  There are plenty of cat's-paw scenarios, including this one, in which the injury wouldn't have occurred if not for the plaintiff's race, and thus that seem to satisfy the but-for standard.  Accordingly, the cat's-paw theory isn't inconsistent with the stricter causal standard.

12

The *Sims* case, on which Westin relies, isn't to the contrary, but rather supports our conclusion. There, we assumed without deciding that a plaintiff could allege cat's-paw liability even under the but-for causation standard, and that to do so, he must allege that the "[lower-level employee's] animus was a 'but-for' cause of, or a determinative influence on, [the decisionmaker's] ultimate decision." 704 F.3d at 1337. We agree and, as already explained, have applied that standard here. *See supra* Part II.B.

### III

For the foregoing reasons, we hold that at this preliminary stage Ziyadat has plausibly alleged a circumstantial prima facie case for racial discrimination in contracting sufficient to survive a motion to dismiss. Whether he ultimately prevails on his claim, of course, will be determined at summary judgment and, if necessary, a trial.

**VACATED** and **REMANDED**.

13