[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-13901

Non-Argument Calendar

————————————————

EBONIE CARLISLE,

Plaintiff-Appellant,

*versus*

RHODES & RHODES FAMILY DENTISTRY,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:20-cv-01895-LSC

————————————————

Before WILSON, BRANCH, and LUCK, Circuit Judges.

BRANCH, Circuit Judge:

Rhodes & Rhodes Family Dentistry ("R&R") fired Ebonie Carlisle, a dental hygienist. R&R says it fired Carlisle because she refused to help with patients, was insubordinate, and behaved combatively. Carlisle sued R&R, claiming, among other things, race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2, -3, and 42 U.S.C. § 1981. R&R then moved for summary judgment, which the district court granted. Carlisle appeals, arguing that the district court erred in granting summary judgment on her claims of race discrimination and retaliation. After review, we affirm the district court's decision.

## I.    Background

R&R, a dental practice owned by sisters Dr. Melinda Rhodes King and Dr. Belinda Rhodes King,[1] employed Carlisle as a dental hygienist. All three women are black. Along with Carlisle, R&R employed Tracy Robinson, Deena Ross, and Heather Tinker as dental hygienists. Robinson is black, while Ross and Tinker are white. Anna Marie Smith and Larrin Durrett, both white, also worked at R&R. And Lindsey Herd, who is white, supervised all employees as the office manager.

---

[1] Because Dr. Melinda and Dr. Belinda share the same last name, we refer to them by their first names throughout this opinion.

According to the R&R Employee Handbook, all R&R employees are employed on an at-will basis. The Handbook explains that "[i]f at any time it is determined that [an employee's] continued employment is not beneficial to the group, Management, in its sole discretion, has the right to dismiss [the employee]." The Handbook also provides that disciplinary action "may take the form of a verbal warning, written warning, suspension without pay, or discharge," and the discipline for an employee's failure to abide by its procedures could "range from oral correction to termination."

Generally, R&R dental hygienists control their patient volume. For example, Carlisle treated 6 to 8 patients a day because she used an hour-long appointment block to treat each patient. Tinker treated 12 to 16 patients a day because she treated a patient every 30 minutes. Ross treated patients every 15 to 20 minutes. Because Tinker and Ross treated more patients, they were assigned an assistant to help them.

While employed at R&R, Carlisle received three employee evaluations. In 2013, Carlisle scored 13's and 14's (out of 15) across the board on her feedback. The comments section reads, "Work[s] well with others and interact[s] with patients in a professional & friendly manner. Always willing to learn new things."

In 2017, in her second evaluation, she scored mostly 13's, 14's, and 15's. While technically exceeding expectations, she scored a 12/15 on Statement 15, which evaluates whether an employee "[i]nteracts with co-workers and patients in a courteous,

tactful and professional manner."  The comments section reads, "Continue to treat team members in a professional manner and display exceptional teamwork and unity."

In her third and final employee evaluation, in April 2019, Carlisle again scored lowest (12/15) on Statement 15, which was circled.  Under the comments section, the evaluation reads: "It's a joy to have you on our team!  We all love your joyful personality, just try to be less playful, more courteous to Lindsey [Herd] because temps/patients might not understand your two's relationship."  Carlisle says she understood that R&R was concerned about her conduct toward Herd.

Dr. Melinda explained in her deposition testimony that Carlisle and Herd would speak to each other in an "unprofessional" manner.  According to Carlisle, she and Herd "played."  For example, they would "pinch" each other on the "bottom" or touch each other's breasts in the hallways.  Robinson testified during her deposition that "everybody" but her behaved like that at work.

In her deposition testimony, Dr. Melinda also explained that they "[were not] hard on [employee] evaluations" because employees are "like . . . family."  Dr. Melinda added that Carlisle "has been talked to on occasions," even though there are no written records of these talks or warnings.

For example, in May 2018, Carlisle was part of an incident with Durrett.  According to Carlisle, Durrett hit Carlisle's knee while opening a drawer.  Carlisle responded by bending down and telling Durrett that she "would punch her in the face" next time

she did that without saying "[e]xcuse me." Durrett, Carlisle, and Herd met to discuss the incident. Carlisle admitted that she does not have any evidence that the way Herd managed the situation was due to race. But Carlisle felt like she was discriminated against because she did not think R&R handled the situation properly.

Then, in June 2019, an incident arose in which Carlisle refused to help a coworker. At 11:50 a.m., Smith asked Carlisle to help with Ross's patient, and Carlisle declined because she had not finished treating her own patient. Carlisle finished with her patient at 11:55 a.m. and spent "around five minutes" cleaning her room and setting up for her 1:00 p.m. patient. At noon, Carlisle took her lunch break. Meanwhile, Ross worked through lunch.

Toward the end of July 2019, Carlisle received an appreciation card from R&R. The card was filled with kind comments from everyone in the office.

On July 31, 2019, Herd called a team meeting to address a lack of teamwork among the hygienists. During the meeting, Herd criticized Carlisle for not helping other employees. Carlisle turned to Tinker and Ross, confronting them about whether they said she never helped them. Both denied saying so. Carlisle says the incident was racially motivated because she was "pulled . . . into a conversation that didn't have anything to do with [her]" and she perceived that she was being picked on.

On August 1, 2019, the day Carlisle was terminated, she met with Dr. Melinda. Carlisle explained that she did not help her coworkers because they did not help her. She complained that the

two white dental hygienists, Ross and Tinker, received the help of an assistant while the two black dental hygienists, she and Robinson, did not. Dr. Melinda stated in her deposition that she understood that Carlisle's complaint was based on a race issue.[2]

Later that day, Carlisle, Dr. Melinda, and Herd met in Herd's office. Carlisle brought up the team meeting from the day before, saying she asked four more coworkers whether they thought she would not help out at work. According to Carlisle, the four coworkers never said she did not help. Herd responded that employees are scared to admit it because they feared Carlisle would "beat them up."

During the meeting, Dr. Melinda, Herd, and Carlisle also discussed the May 2018 incident with Durrett. Carlisle demonstrated what unfolded between her and Durrett. Dr. Melinda explained during her deposition testimony that Carlisle's "tone and . . . body language [were] very hostile." Dr. Melinda says Carlisle was "heated," "invad[ed] [Herd's] personal space," and was "very, very expressive and belligerent." Dr. Melinda told Carlisle that she was acting disrespectfully toward Heard. Carlisle concedes that she and Herd raised their voices.

Herd told Carlisle that she "could have fired [her]" after the May 2018 incident with Durrett and "should fire [her] now[.]"

---

[2] Prior to August 1, 2019, Carlisle did not complain to Dr. Melinda or Dr. Belinda about race discrimination at work. And she does not recall complaining to Herd about race discrimination, either.

22-13901               Opinion of the Court                 7

Dr. Melinda said she had to agree with Herd's decision.   Dr. Belinda arrived and said they "need[ed] to discuss [it] first."   Dr. Melinda sent Carlisle home for the rest of the day.

Around 5:30 p.m., Dr. Melinda, Dr. Belinda, and Herd called Carlisle to tell her she was fired.   Carlisle was told that she was terminated "because she failed to assist with patients, was insubordinate, and displayed hostile behavior."

Carlisle, in her deposition, testified she has no evidence that Dr. Melinda and Dr. Belinda were motivated by race when they fired her.   But Carlisle felt that she was discriminated against because, in her view, R&R handled the situation improperly.

Carlisle sued R&R alleging race discrimination based on disparate treatment, race discrimination based on discriminatory discharge, and retaliation in violation of Title VII and 42 U.S.C. § 1981.   R&R moved for summary judgment.

The district court granted R&R's motion for summary judgment.   As to Carlisle's claims under Title VII, the court found that Carlisle failed to demonstrate that R&R employed 15 or more employees, and thus did not prove Title VII applied.[3]   But the court still analyzed the merits of all Carlisle's claims.

---

[3] Title VII's proscriptions against unlawful employment practices apply only to entities that have "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

The court concluded that Carlisle failed to establish a *prima facie* case for disparate treatment but that she met her initial burden of establishing a *prima facie* case for the discriminatory discharge and retaliation claims.  The court then acknowledged, as Carlisle conceded, that R&R "satisfied its burden to articulate . . . legitimate non-discriminatory reason[s]" for firing Carlisle.  But, the court explained, Carlisle did not satisfy her burden of establishing that the proffered reasons were pretextual and that the real reason was unlawful discrimination.  As a result, the court concluded that Carlisle "failed to provide 'sufficient evidence of racial discrimination to create a triable factual dispute.'" (quoting *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)).  The district court thus granted R&R's motion for summary judgment.[4]

Carlisle timely appealed.

---

[4] In its pretext discussion, the district court also noted that "by showing other employees outside the protected class engaged in similar acts and were not similarly treated, Plaintiff has indirectly shown that [R&R's] proffered reason is possibly unworthy of credence."  Pointing to this line, Carlisle moved to alter, amend, or vacate the judgment under Rule 59.  She asserted that the court's acknowledgment to this point suggested that "a reasonable juror could *possibly* find the reasons unworthy of credence," thereby establishing a genuine issue of material fact. (emphasis in original).

The district court denied Carlisle's motion, explaining that the statement "was mistakenly included in the Court's discussion of pretext and should be stricken."  It concluded that it found "no manifest errors of law or fact that would justify vacating its previous decision."  Because the statement was stricken from the record, any reliance on it by Carlisle lacks merit.

## II.    Discussion

Carlisle argues that the district court erred in granting summary judgment on her claims for several reasons.  The sole issue on appeal is whether the district court erred in granting summary judgment to R&R as to Carlisle's retaliation and discriminatory discharge claims under 42 U.S.C. § 1981 by finding that Carlisle failed to demonstrate pretext.[5]

After review, we agree that Carlisle has failed to show pretext.  Accordingly, we affirm the district court's grant of summary judgment for R&R.

We review *de novo* the district court's grant of summary judgment.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Although all justifiable inferences are to be drawn in

---

[5] Carlisle has abandoned any challenge to the denial of her claims under Title VII because she failed to challenge the district court's conclusion that she did not establish Title VII's numerosity requirement.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect.  When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, [s]he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed.").  Similarly, she has abandoned any challenge to the denial of her disparate treatment claim under § 1981 by failing to address it in her brief.  *Id.* at 681.

favor of the nonmoving party, inferences based upon speculation are not reasonable." *Kernel Records Oy*, 694 F.3d at 1301 (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Before granting summary judgment to a party, "[a] court must decide whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quotations omitted).

Section 1981 prohibits intentional race discrimination in the enforcement of public and private contracts, including employment contracts. *See* 42 U.S.C. § 1981; *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459–60 (1975). Such race discrimination includes retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008). It also includes discriminatory discharge. Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071.

Section 1981 discrimination claims that rely on circumstantial evidence are evaluated under the *McDonnell Douglas*[6] burden-shifting framework. *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255–57 (11th Cir. 2012).[7] Under

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[7] Claims of race discrimination under Title VII and 42 U.S.C. § 1981 are evaluated using the same analytical framework. *See Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 (11th Cir. 2000)

*McDonnell Douglas*, the employee bears the initial burden to establish a *prima facie* case of discrimination or retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If an employee establishes a *prima facie* case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* The employee then bears the burden to show that the employer's reason is a pretext for unlawful discrimination. *Id.* at 802–04.

Applying the *McDonnell Douglas* framework, we need not address whether Carlisle established *prima facie* cases of retaliation and discriminatory discharge. Although R&R disputes whether Carlisle met her *prima facie* burden for the retaliation claim, assuming arguendo that she did, the district court correctly concluded that both of Carlisle's claims failed at step three for lack of pretext. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). The parties agree that R&R proffered a legitimate, nondiscriminatory reason for her termination. Thus, this opinion focuses solely on whether Carlisle proved pretext.

A plaintiff can show pretext by demonstrating that the defendant's proffered reason is so weak, implausible, inconsistent, incoherent, or contradictory "that a reasonable factfinder could find [the reason] unworthy of credence." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quotations omitted). A plaintiff can also prove pretext by showing "*both* that the [proffered] reason was false, *and* that discrimination was the real reason" for the adverse action. *St. Mary's Honor Ctr.*, 509 U.S. at

515. The plaintiff cannot merely make conclusory allegations and assertions. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

"[W]e have repeatedly and emphatically held" that employers may fire an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Flowers*, 803 F.3d at 1338 (quotations omitted). Therefore, even if a plaintiff's evidence supports an inference that the proffered reason is "pretext of *something*," summary judgment is appropriate if the plaintiff does not produce evidence that the reason was pretext for unlawful discrimination. *Id.* at 1337–38. Finally, an employer's honest belief that the employee violated its policies can constitute a legitimate reason for termination, even if such a belief may have been mistaken or wrong. *See Smith v. PAPP Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987).

In addition, to prevail on § 1981 claims, a plaintiff is required to show "that, *but for* race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014, 1019 (2020) (emphasis added); *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1297 (11th Cir. 2021).

Carlisle claims that she demonstrated pretext by sufficiently rebutting the accusations that she engaged in combative,

insubordinate behavior and that she refused to help her coworkers.[8]

We agree with R&R for three reasons. First, Carlisle failed to show pretext because she cannot prove (1) that the proffered reasons for termination were false, and (2) "that discrimination was the real reason" for Carlisle's termination. *See St. Mary's Honor Ctr*,

---

[8] Carlisle asserts that she proved pretext for two more reasons that are easily discarded. First, she says she proved pretext by arguing that R&R did not follow its own disciplinary policies. She is correct that a plaintiff can prove pretext by "establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis*, 934 F.3d at 1186. But her conclusory allegation alone is not enough to survive summary judgment. *Bryant*, 575 F.3d at 1308.

Second, Carlisle argues that she presented evidence of pretext by demonstrating the suspicious timing of her termination following her complaint of racial discrimination on August 1. But to the extent that Carlisle made this argument before the district court, she only raised it in terms of establishing a *prima facie* case for retaliation—not in terms of establishing pretext. Because Carlisle did not raise a temporal proximity theory to support her argument for pretext before the district court, we need not consider it now. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004); *see also Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001). And even if we were to address the merits, we have held that "[w]hile close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020) (en banc). In addition, "the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023). Carlisle's temporal proximity argument therefore fails because she has not provided any other evidence of pretext, and evidence of her combative and hostile misconduct severs any causal inference.

509 U.S. at 515. While Carlisle disputes being combative or insubordinate, her assertions do not refute that R&R held an honest belief that she engaged in insubordinate and hostile behavior. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (finding plaintiff's pretext argument failed because he "offered no probative evidence to challenge" defendant's asserted belief in allegations); *see Smith*, 808 F.2d at 1452–53. As the district court noted, the record reflects that R&R was concerned about Carlisle's behavior "in the year and three months" before her termination. In May 2018, Carlisle threatened to punch Durrett in the face. Then, in April 2019, her performance evaluation instructed her to be more courteous to Herd, and Carlisle acknowledged that, as of this date, she knew that R&R was concerned about her behavior toward Herd. On August 1, 2019, Carlisle got into a heated argument with Herd in which they "scream[ed] at one another." Although Carlisle asserts that she "felt" that the decision to terminate her was racially motivated, she readily admitted throughout her deposition that she had no evidence to support her claim that her termination was racially motivated. Carlisle's conclusory allegations that R&R's decision to terminate her was based on her race are not enough to survive summary judgment. *Bryant*, 575 F.3d at 1308. Thus, she failed to prove that R&R's stated reasons for her termination were false and that the real reason was unlawful racial discrimination. Second, for the same reasons, Carlisle has failed to show that R&R's proffered justifications for firing her—that she was insubordinate and hostile—were "so weak, implausible, inconsistent, incoherent, or

contradictory that a reasonable factfinder could find the reason unworthy of credence." *Alvarez*, 610 F.3d at 1265. Third and finally, Carlisle failed to show that race was a "but-for" cause of her termination. *Comcast Corp.*, 140 S. Ct. at 1014, 1019; *Ziyadat*, 3 F.4th at 1297. She also failed to show that "but-for" her statutorily protected conduct—complaining to Dr. Melinda on August 1—she would not have been fired. *Comcast Corp.*, 140 S. Ct. at 1014, 1019; *Ziyadat*, 3 F.4th at 1297. Thus, Carlisle cannot prevail on her § 1981 claims.[9]

Carlisle resists this conclusion for three reasons. First, she argues that there is a genuine issue of material fact about whether she refused to help with patients—one of the stated reasons for her termination. But, as R&R points out, the district court did not rest its opinion on whether Carlisle refused to see patients. Rather, the court addressed her insubordination and hostile behavior— behaviors sufficient to justify her termination.

Second, Carlisle argues that her firing was pretextual because it conflicted with outdated performance evaluations and an appreciation card. But her three reviews occurred before her

---

[9] Also on appeal, Carlisle argues that she established a "convincing mosaic" of circumstantial evidence to prove discriminatory conduct. The convincing-mosaic framework is an evidentiary approach in which "an employe may prove [discrimination] with any circumstantial evidence that creates a reasonable inference of [discriminatory] intent." *Berry*, 84 F.4th at 1310; *Flowers*, 803 F.3d at 1335. For the reasons explained above, Carlisle's circumstantial evidence does not raise a reasonable inference of discriminatory discharge or retaliation.

final altercations with Herd and therefore do not reflect R&R's opinion of her in the final days of her employment.  Still, her performance evaluations and the appreciation card are not inconsistent with her firing.  In her April 2019 evaluation—the only evaluation that occurred after the 2018 incident with Durrett—Carlisle was explicitly instructed to be more courteous to Herd.  As already mentioned, Carlisle acknowledged that she knew that R&R was concerned about her behavior toward Herd.  On her 2017 and 2019 evaluations, she scored lowest on Statement 15: "Interacts with co-workers and patients in a courteous, tactful and professional manner."  And although the appreciation card does not indicate any combative or insubordinate behavior on Carlisle's part, it makes sense that fellow employees would not criticize Carlisle in an appreciation card.

Third, Carlisle argues that other coworkers got into disagreements with Herd and were not fired.[10]  But the evidence does not reflect that any other employee threatened a coworker with physical violence, nor does it reflect that any other employee

---

[10] Carlisle also argues that she and Durrett were treated differently, evidencing racism.  But the record refutes her argument.  First, the record shows that Herd treated Carlisle and Durrett equally when she conferenced with them after the May 2018 incident.  Carlisle admits she does not have any evidence that the way Herd managed the situation was due to race.  Second, there is no record evidence that Durrett engaged in combative or hostile behavior like Carlisle did.

22-13901                Opinion of the Court                17

screamed at Herd and invaded her personal space.[11]    Thus, Carlisle's counterarguments fall short.

### III.    Conclusion

Accordingly, for the above reasons, the district court did not err in granting summary judgment to R&R on Carlisle's retaliation and discriminatory discharge claims under 42 U.S.C. § 1981.

**AFFIRMED.**

---

[11] Carlisle says she was provoked into bringing up the 2018 incident with Durrett during the August 1 meeting in Herd's office, during which she screamed at Herd and invaded her personal space.  But even if Carlisle was "provoked," that fact is irrelevant because it does not aid Carlisle in meeting her burden to establish that R&R's legitimate, nondiscriminatory reasons for her termination were a pretext for unlawful racial discrimination.