[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13527

_____

GUATEMION JUAN MOSLEY,

Plaintiff-Appellant,

*versus*

PRESTON CYCLES WEST, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-03937-SCJ

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

LUCK, Circuit Judge:

Guatemion Mosley appeals the district court's summary judgment for his former employer, Preston Cycles West, LLC, on his race discrimination claims under Title VII and section 1981. The district court granted summary judgment because Mosley failed to make out a convincing mosaic that his general manager recommended firing him because of his race. And Mosley failed to show that the general manager's recommendation tainted the final decisionmaker's call to fire him under a cat's paw theory. Because we agree with the district court that the final decisionmaker made an independent decision to fire Mosley that was untainted by racial animus, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Preston Cycles hired Mosley in April 2017 to work as a sales associate at Thunder Tower West Harley-Davidson, a motorcycle dealership in Morrow, Georgia that caters primarily to an African American clientele. The dealership is owned and operated by Gene Preston through Preston Cycles, his wholly owned LLC. Preston takes an active role in operating the dealership at a macro level, and he participated in the decision to hire Mosley, who, like Preston, is African American. But Preston delegates many day-to-day aspects of the operation—like reviewing individual associates' sales figures—to his management staff.

As a sales associate Mosley's duties included reporting to work on time, working together with his coworkers, and soliciting

sales.  Mosley's sales manager during his first few months at the dealership was Clarence Moon.  Preston Cycles then hired Robert Hammers as general sales manager above Moon in August 2017. When Hammers arrived at the dealership he met with the sales associates and confirmed his expectations for them, including that they needed to arrive to work on time, be productive, and work together as a team.  Throughout his tenure at the dealership Hammers also told the sales associates that they needed to follow any directions he, Preston, or the general manager gave them.

Mosley was among the top sales associates in terms of revenue generated for the dealership.  But despite Mosley's high numbers, problems quickly arose with his work at the company.  Over time, both Preston and Hammers noticed that Mosley frequently refused to help with tasks assigned to all sales associates.  When asked, Mosley would say that he didn't want or need to do them because of his high sales numbers.  For example, Hammers and Moon told sales associates to call potential customers when they didn't have other work to do.  Mosley routinely refused.  Mosley also frequently didn't show up to work early enough to help with pre-opening tasks, like driving the motorcycles to the front of the dealership to display them.  When Mosley did show up on time, he'd refuse to help.  And he often didn't make productive use of his downtime at work like he was told to do.  Instead, he'd sit around not doing anything or watching videos on his cellphone.

Mosley also didn't work as part of the team.  Preston and Hammers saw, and heard about, Mosley having disagreements

with other sales associates about who'd get to work with a customer or receive sales commissions. It wasn't unheard of for sales associates to argue, but Preston and Hammers thought Mosley did it more often than others and that he usually instigated the arguments.

While Mosley worked at Preston Cycles, he and Preston talked for up to half an hour each day and occasionally discussed Mosley's career at the dealership. During these conversations, Mosley expressed an interest in switching to the dealership's finance and insurance department, which Preston said he'd support. Preston hoped that Mosley would improve his attitude and performance so that he could make the switch.

But Mosley's attitude and performance did not improve, causing Hammers to write up Mosley multiple times. One came in November 2017 when Mosley didn't report to work on time. And Hammers planned to write up Mosley yet again for showing up to work late toward the end of 2017. But wanting to move forward in a positive manner and motivate Mosley to improve, Hammers only showed Mosley this write up and then threw it away in front of him.

Following these incidents, Hammers completed a formal evaluation of Mosley in December 2017. Mosley's evaluation was mostly positive, but Hammers noted concerns about Mosley's attitude and performance by marking that Mosley needed to improve his: (1) "[a]cceptance and implementation of suggestions," (2) "[a]mount of work performed," (3) "[a]djust[ment] to work

situation[s]," (4) "[a]ttitude and cooperation," (5) "[p]roductivity," and (6) "[d]ependability."

Yet, even with the negative evaluation and write ups, Mosley's attendance didn't improve. On February 17, 2018, almost two hours after Mosley was supposed to be at work, he called his manager and said he was having car trouble. Mosley never ended up getting to work that day. Hammers wrote up Mosley shortly after the incident, and Preston and Hammers agreed to suspend Mosley without pay for a week due to his repeated attendance problems.

The next month Preston Cycles hired Jeff Lewis as the dealership's general manager. Lewis had a "brusque" management style, quick temper, and harsh way of speaking to employees. He was disrespectful, belligerent, demoralizing, and aggressive toward his subordinates.

Specifically, there's evidence that Lewis targeted African Americans with demeaning, insulting, derogatory, and degrading behavior. He criticized Mosley's clothing—like Mosley's tie-dyed "True Religion" jeans—and told Mosley that his clothes made him "look[] like someone from the street." Lewis regularly described the behavior of Mosley and another employee, both of whom were African American men, as "shucking and jiving." And on at least one occasion, Lewis called Mosley a "homeboy" and said that he was "blacker than the rest" of the African American employees because he "act[ed] like a street person."

Lewis also made these sorts of derogatory remarks without directing them at Mosley. Lewis, for example, once cornered

Jameson Previte, a white sales associate, and told him that his clothes didn't fit the culture of the dealership and that he "looked like one of [the dealership's] customers." At another point, Lewis commented on the creditworthiness of African Americans and asked an employee for the race of a potential customer.

In April 2018, shortly after Lewis joined the dealership, he and Hammers recommended that Preston Cycles fire Mosley since there had been no improvement in Mosley's attitude and performance following his December 2017 evaluation, including in his unwillingness to follow directions or work as a member of the team.[1] Preston, as the owner of the company, made the final call to fire Mosley. Though Hammers and Lewis recommended Mosley's firing, Preston made his final decision "based [on his] own interactions with [Mosley] and [his] own observations of [Mosley's] conduct and attitude toward the [d]ealership's management," including Mosley's issues with teamwork, following directions, and his attitude.

Mosley was given the news on April 18, 2018. When Mosley asked why he was fired, Hammers informed him that he "didn't do anything" and that Preston Cycles was "just moving in a different

---

[1] There's some evidence in the record that Hammers alone recommended firing Mosley and that Lewis simply supported that recommendation. But other evidence suggests they jointly made the recommendation. Because we must view the evidence in the light most favorable to Mosley, *see Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021), we assume that Lewis and Hammers jointly recommended that Preston—the final decisionmaker—fire Mosley.

direction." The next day Previte overheard Lewis say that Mosley was fired because he wouldn't listen to a thing Lewis said to him and wore "FUBU" clothing ("For Us By Us," a brand Mosley maintains is predominately worn by African Americans) to work. Within days of Mosley's termination, Preston Cycles hired an African American female to replace him.

Mosley, in response, sued Preston Cycles for race discrimination under Title VII and section 1981, alleging that he was fired because of Lewis's animus toward African Americans.[2] To support his race discrimination claims, Mosley alleged that he was fired only after Lewis became the dealership's general manager and that Lewis caused his firing by "serv[ing] as a decision maker . . . and/or [being] instrumental in making recommendations concerning hiring and firing decisions."

Following discovery, Preston Cycles moved for summary judgment because Mosley had "not identified any evidence whatsoever of discrimination on the basis of his race." Mosley responded that Lewis "engaged in a series of overtly racist behavior toward and concerning African[]Americans which culminated in the termination of [his] employment," and Preston Cycles was liable for Lewis's behavior "pursuant to a cat's paw theory."

The district court granted summary judgment for Preston Cycles because: (1) Lewis's comments and conduct did not make

---

[2] Mosley also included hostile work environment and retaliation claims, but he does not pursue them on appeal.

8                    Opinion of the Court                    21-13527

out a convincing mosaic that he wanted to fire Mosley based on race; and (2) even if they did, Preston Cycles was not liable under a cat's paw theory because there was no evidence that Lewis tainted Preston's (the decisionmaker's) call to fire Mosley. Mosley appeals the summary judgment for his former employer.

## STANDARD OF REVIEW

We review de novo the district court's summary judgment order. *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1276–77 (11th Cir. 2001).

## DISCUSSION

On appeal, Mosley challenges both of the district court's conclusions. First, he argues the district court erred in concluding that he did not establish a convincing mosaic that Lewis recommended firing him because of his race. And second, Mosley contends the district court erred in finding no evidence that Preston acted as Lewis's cat's paw when he made the decision to fire Mosley.[3] We disagree.

---

[3] Mosley also maintains the district court erred when it "expressly weighed the evidence" by considering the totality of the circumstances, including "mitigating circumstances." But the district court didn't weigh the evidence. As we said to do in *Smith v. Lockheed-Martin Corp.*, the district court evaluated whether all the circumstances, taken together, created a dispute of fact about why Mosley was fired. *See* 644 F.3d 1321, 1346–47 (11th Cir. 2011) ("Based on the *totality of the . . . circumstances . . .* a jury could infer that [the employer] displayed a racially discriminatory animus toward [the plaintiff]." (emphasis added)). The district court does not err when it does what we've told it to do.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The same is true under section 1981. *See Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. [section] 1981 are also the same as a Title VII disparate treatment claim in the employment context.").

To determine whether an employee was fired "because of" his race, *see Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (citation omitted), we usually "look only to the conduct of the decisionmaker—the party with the 'power to actually [fire] the employee.'" *Lewis v. City of Union City*, 934 F.3d 1169, 1196 (11th Cir. 2019) (Tjoflat, J., concurring in part and dissenting in part) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)). But in some cases "a [biased] discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Stimpson*, 186 F.3d at 1331. A plaintiff who relies on a biased recommendation must establish a "truly direct" link between the recommendation and the decision to fire him. *Id.* He must therefore show that the recommender's unlawful bias, rather than his own underlying misconduct, "was an actual cause of the decision to terminate" him. *Id.*

One way he can do that is under the "cat's paw" theory, "under which a lower-level employee's animus can be imputed to a

decisionmaker." *See Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1298 (11th Cir. 2021). Under the cat's paw theory, a decisionmaker acts as a biased recommender's cat's paw when "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee"—that is, without making an "independent decision" that firing the employee was justified. *Stimpson*, 186 F.3d at 1332. In other words, for the cat's paw theory to apply, the decisionmaker must have "merely 'rubber stamped'" the biased recommendation. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (parenthetically quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir. 1996)). That's because "[w]here a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee," and he is not acting as the subordinate's cat's paw. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001).

Here, Mosley contends that Preston's decision was tainted by racial animus under a cat's paw theory because Preston adopted Lewis's biased recommendation to fire him. The problem for Mosley, though, is that the undisputed evidence shows that Preston didn't simply "rubber stamp[]" Lewis's recommendation. *See Llampallas*, 163 F.3d at 1249 (quoting *Long*, 88 F.3d at 307). According to Preston, Lewis and Hammers recommended that he fire Mosley because of Mosley's "excessive tardiness, excessive absenteeism, and an unwillingness to cooperate as part of the team in training sessions, an unwillingness to train new individuals that were members of the sales team, and just generally not participating in the

day-to-day routine operation of the dealership." But Preston didn't take Lewis and Hammers's word for it—he knew about Mosley's misconduct and reached an independent decision to fire Mosley without relying on their recommendations.

As the owner of the dealership, Preston was "involved in the [d]ealership's operations" and was "generally aware of the day-to-day operations." In that capacity, Preston "repeatedly received reports" that Mosley refused to follow directions and was told that Mosley didn't make productive use of his time, refused to call potential customers, and "frequently" refused to help with tasks around the dealership.

Preston also had firsthand knowledge about Mosley's short-comings. The two spoke for up to half an hour each day, so Preston was very familiar with Mosley by the time he decided to fire Mosley. And Preston personally "observed [that Mosley] fail[ed] to follow directions or respond[] to his supervisors' directions," frequently didn't get to work on time, reacted with hostility when procedures were changed, and refused to help with pre-opening tasks. Preston also witnessed multiple arguments Mosley instigated with his coworkers. "From [his] observations and interactions with [Mosley]," it was Preston's "opinion that [Mosley] was only interested in increasing his own sales numbers and not in assisting other [m]otorcycle [s]ales [a]ssociates to improve their sales."

Preston's view of Mosley, his attitude, and his performance, aligns with how Preston acted before Lewis's recommendation. Preston "agreed" with the criticisms of Mosley in the December

2017 evaluation and "encouraged [Mosley] to learn from" them. And when Mosley didn't learn from them and failed to show up to work one day, Preston agreed to suspend Mosley for a week over his attendance issues.

Consistent with how Preston acted in the lead up to Lewis's recommendation, Preston made clear in his declaration that he fired Mosley because he "did not see an improvement in [Mosley's] attitude," a "willingness to follow directions," or an ability to "work cooperatively as a member of the . . . team" after the December 2017 evaluation, and "[i]t appeared . . . that [Mosley] had no intention of changing his attitude or conduct." So, "based upon [his] own interactions with [Mosley] and [his] own observations of [Mosley's] conduct and attitude toward the [d]ealership's management," he made the call to fire Mosley.

Mosley hasn't cited any evidence to rebut Preston's sworn declaration showing Preston made his decision to fire Mosley based on what he already knew about Mosley's attitude and conduct. Instead, the undisputed evidence shows that, rather than acting as a mere "conduit" of Lewis's animus, Preston reached his own independent decision to fire Mosley. *See Stimpson*, 186 F.3d at 1332. And since Preston made an independent decision to fire Mosley, Mosley has failed to establish any link, much less a "truly direct" one,

21-13527                Opinion of the Court                13

between Lewis's recommendation to fire Mosley and Preston's decision to go through with it.[4]  *See id.* at 1331.

As a fallback, Mosley offers up another version of the cat's paw theory from *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). There, the Supreme Court held "that if a supervisor performs an act motivated by [a prohibited] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at 422 (citation omitted).  Mosley argues that Preston Cycles is liable under the *Staub* cat's paw theory because Lewis made his recommendation to fire Mosley based on racial animus, Lewis intended for Preston to fire Mosley, and Lewis's recommendation started the process that caused Mosley's termination.

We rejected the same argument in *Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013).  *Staub*, we explained in *Sims*, interpreted the Uniformed Services Employment and Reemployment Rights Act, but the "text of the USERRA and the" Age Discrimination in Employment Act—the statute at issue in *Sims*—"differ[ed] in important respects."  *Id.* at 1335.  The USERRA "requires that a

---

[4] That's especially the case here because Preston also heard about Mosley's misconduct from an independent source—Hammers—who wrote up Mosley multiple times and gave the December 2017 evaluation before Lewis joined Preston Cycles.  Mosley has not argued, and the summary judgment evidence does not show, that Hammers's recommendation to fire Mosley was racially motivated.

plaintiff demonstrate discrimination by showing that the pro-scribed bias was a 'motivating factor' in the adverse decision," *id.* (quoting 38 U.S.C. § 4311(c)), while "the ADEA states that it is un-lawful if an employee suffers adverse employment action *'because of* such individual's age,'" *id.* (quoting 29 U.S.C. § 623(a)(1)). The different language in the discrimination statutes mattered, we con-tinued, because "a 'but-for' cause requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse decision." *Id.* at 1335–36 (citation omitted). The Supreme Court has cautioned us to "be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Id.* at 1336 (quotation omitted). "Because the ADEA require[d] a 'but-for' link between the discriminatory animus and the adverse em-ployment action as opposed to showing that the animus was a 'mo-tivating factor' in the adverse employment decision," we held in *Sims* that the *Staub* cat's paw theory did "not apply" to ADEA claims. *Id.*

For the same reason, the *Staub* cat's paw theory doesn't ap-ply to Mosley's single-motive Title VII and section 1981 claims.[5] His single-motive Title VII claim requires the same but-for link as the ADEA. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("In the language of law, this means that Title VII's 'because of' test incorporates the simple and traditional standard of but-for

---

[5] At oral argument, Mosley confirmed that he brought a single-motive Title VII claim and not a mixed-motive one.

21-13527                 Opinion of the Court                          15

causation." (quotations omitted)).  And so does Mosley's section 1981 claim.  *See Ziyadat*, 3 F.4th at 1297–98 ("Under but-for causation statutes, like [section] 1981, we ask whether the discriminatory conduct had a 'determinative influence' on the injury." (quoting *Sims*, 704 F.3d at 1336)).  "Because" both claims also "require[] a 'but-for' link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a 'motivating factor' in the adverse employment decision," we reach the same conclusion that we did in *Sims*.  *See* 704 F.3d at 1336.  The *Staub* cat's paw theory does not fit here.[6]

There's another reason why the *Staub* cat's paw theory does not help Mosley.   Under *Staub*, "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable." 562 U.S. at 421.  In other words, the employer will not be liable under *Staub* if its independent investigation determines "that the adverse action was, apart from the supervisor's recommendation, entirely justified."  *Id.*

That's the case here.  Following Lewis's recommendation, Preston independently reviewed what he knew about Mosley's attitude, unwillingness to follow directions, and inability to be a team

---

[6] Of course, our analysis would be different if Mosley had brought a mixed-motive Title VII claim, which, like the USERRA, only requires that the employee establish that race was a "motivating factor" for a discriminatory "employment practice."  42 U.S.C. § 2000e-2(m); *Staub*, 562 U.S. at 416–17 (comparing mixed-motive Title VII claims to claims under the USERRA).

player.  *See id.*  Preston knew Mosley had been told to improve his attitude in the December 2017 evaluation—which Preston agreed with—and that Mosley frequently refused to do what his managers told him to do, like call customers or help with tasks around the store.  And Preston also knew Mosley wasn't a team player; Preston saw him instigate several arguments with his coworkers over customers and sales commissions.  After receiving Lewis's recommendation, Preston reviewed these issues, determined that Mosley hadn't improved them, and fired him because of it.  Mosley hasn't offered anything that rebuts Preston's independent knowledge about these issues or shows Preston was wrong about them.  Thus, the undisputed evidence shows that Preston's decision to fire Mosley was unrelated to Lewis's biased recommendation—it was based on, and entirely justified by, Preston's own knowledge and evaluation of Mosley's attitude and conduct.  That means Preston Cycles can't be held liable for Lewis's biased recommendation under the *Staub* cat's paw theory.  *See id.*

## CONCLUSION

In the end, Mosley has failed to show that any discriminatory animus held by Lewis—or anyone else at the dealership—had a determinative influence on the decisionmaker's (Preston's) call to fire him.  Instead, the record shows that Preston Cycles did exactly what it said it did when Mosley asked why he was fired—it "mov[ed] in a different direction" by parting ways with Mosley and

21-13527                Opinion of the Court                17

bringing in another employee who would be a team player and listen to her supervisors.

**AFFIRMED**.